**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| Shannan Davis,<br><br>Plaintiff,<br><br>v.<br><br>USHealth Advisors, LLC,<br><br>Defendant. | CASE NO.: 8:25-cv-02779-CEH-AAS |

**DEFENDANT USHEALTH ADVISORS,**
**LLC'S MOTION TO COMPEL ARBITRATION**

Pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, Defendant USHEALTH Advisors, LLC ("USHA") moves to compel arbitration and to stay this proceeding under Section 3 of the FAA until the arbitrator enters a final award.

**PRELIMINARY STATEMENT**

Plaintiff Shannan Davis filed her Class Action Complaint on October 21, 2025. *See* Dkt. No. 1 ("Complaint"). This is Plaintiff's third class action lawsuit involving the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA") since September 2023.[1] Plaintiff attempts to assert five causes of action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA") and the Florida Telephone Solicitations Act, Fla. Stat. § 501.059 *et seq*. ("FTSA"), alleging

[1] *See Davis v. Enhance Health LLC*, No. 8:23-cv-02369-WFJ-SPF (M.D. Fla.); *Davis v. LifeMD Inc.*, No. 8:23-cv-02138-VMC-J_S (M.D. Fla.).

she received telephone calls and text messages in violation of the TCPA "do-not-call" rules and the FTSA rules against solicitation calls. *See id.* at ¶¶ 62-76. Plaintiff also seeks to represent a nationwide class. *See id.* at ¶ 9. However, on February 6, 2025, she knowingly and voluntarily provided her telephone number on the website https://healthmarketadvisor.com (the "Site"), consenting to receive telephone calls and text messages from or regarding, among others, USHA. More importantly for purposes of this Motion, Plaintiff agreed to Terms of Service on the Site requiring arbitration of her claims, waiving participation in a class action, and providing for the arbitrator – not the Court – to decide issues of arbitrability. Under settled principles of law and in furtherance of the strong federal policy in favor of enforcing agreements to arbitrate, the Court should enforce the agreement and compel Plaintiff to proceed to arbitration. Indeed, another federal court only a few months ago compelled arbitration in another TPCA lawsuit arising from a submission made on ***the exact same website*** with virtually-identical layout and language. *See Thomas v. HealthMarkets Ins. Agency, Inc.*, No. 5:24-cv-01448-JGB-SHK, Dkt. No. 37 (C.D. Cal. Jun. 30, 2025) (attached as Exhibit AA).

## STATEMENT OF FACTS

On February 6, 2025, at or around 6:24 a.m. Eastern Daylight Time, Plaintiff knowingly and voluntarily provided her telephone number and other personal information on the Site. *See* Declaration of Kat Giardina, Exs. A & D. The Site is owned and operated by Digital Media Solutions, LLC ("DMS"). *Id.* at ¶ 3. Upon landing on the Site, Plaintiff was offered the opportunity to obtain health insurance

quotes. *Id.* at ¶ 8. Plaintiff submitted certain personal information, including her telephone number (863-308-5155). *Id.* Plaintiff entered that telephone number on the Site and was required to click a button labeled "Compare Rates" to submit her information. *Id.* at ¶ 9. This information for Plaintiff would not have been generated on the Site nor provided by DMS had Plaintiff not made a submission on the Site. *Id.* at ¶ 7.

As reflected in the data provided by DMS from Plaintiff's Site submission, as well as the Jornaya TCPA Guardian Report and "Visual Playback" feature, Plaintiff provided her information, including her telephone number, and clicked the "Compare Rates" button on February 6, 2025. *See id.* at ¶¶ 17-22 & Exhibits A & D thereto. The layout of the Site on February 6, 2025 was such that appearing directly before her on the same screen, immediately below the "Compare Rates" button, was the following language:

> By clicking the button above, I expressly consent to receive emails, calls and/or text messages, for marketing purposes, regarding insurance quotes, or other products and services on behalf of Healthmarketadvisor.com partners, including companies like InsureMe, Inc., using my provided telephone number (863) 308-5155 (including any wireless number) even if it's on a federal, state or corporate do-not-call list. I acknowledge calls may be AI-generated, or contain pre-recorded messages using artificial voice and/or placed using an automated telephone dialing system. I understand consent is not required to purchase and that I may revoke my consent at any time. To receive this information without providing this consent, skip. Applicable text messaging rates may apply. I agree to the Privacy Policy and Terms of Service provided.

*Id.*

A partial screenshot of the form submission page as it appeared on February 6, 2025 is below:




*Id.* at ¶ 10.

As reflected in the database entry provided by Digital Media Solutions ("DMS"), Plaintiff submitted her telephone number to the Site, and the information she submitted was provided to USHA only because she clicked "Compare Rates" and confirmed her consent to be contacted. *Id* at ¶¶ 4-7 & Exhibit A thereto. Clicking on the blue "Terms of Service" link opens up a new window or tab containing the Site's Terms of Service. *Id.* at ¶ 13. Through its records, DMS is able to confirm and produce the Terms of Service that would have appeared on the Site on any particular day. *Id.* In the third paragraph, the Terms of Service on February 6, 2025 informed the reader of arbitration and class waiver provisions

and their broad scope:

> **PLEASE REVIEW THE TERMS OF THE AGREEMENT CAREFULLY. IF A USER DOES NOT AGREE WITH THE TERMS OF THE AGREEMENT IN THEIR ENTIRETY, THAT USER IS NOT AUTHORIZED TO USE THE SITE OFFERINGS IN ANY MANNER OR FORM.**
>
> **THE AGREEMENT CONTAINS DISCLAIMERS OF WARRANTIES, LIMITATIONS OF LIABILITY, RELEASES, A CLASS-ACTION WAIVER, AND THE REQUIREMENT TO ARBITRATE ANY AND ALL CLAIMS THAT MAY ARISE HEREUNDER AGAINST COMPANY, AS WELL AS ITS PARENT, SUBSIDIARIES, RELATED PARTIES, THIRD-PARTY SERVICE PROVIDERS AND MARKETING PARTNERS (COLLECTIVELY, "COVERED PARTIES"), WHO ARE EXPRESS THIRD-PARTY BENEFICIARIES OF THE MANDATORY ARBITRATION PROVISION. THE AFOREMENTIONED PROVISIONS ARE AN ESSENTIAL BASIS OF THE AGREEMENT.**

*Id.*, Ex. C at page 1.

The arbitration provision in the Terms of Service appears under the heading "19. Dispute Resolution Provisions" (hereinafter the "Arbitration Agreement"), and states, in part:

> The Agreement shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles). **You hereby agree to arbitrate all claims that may arise under the Agreement that you may have against Company or any of the Covered Parties, who are express third-party beneficiaries of the mandatory arbitration provision. Without limiting the foregoing, should a dispute arise between you and Company and/or any Covered Party including, without limitation, any matter concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto: (a) you agree to submit the dispute for resolution by arbitration before the American Arbitration Association in New York, New York, in accordance with the then current Commercial Arbitration rules of the American Arbitration Association (the "AAA") . . . .**
>
> **To the extent permitted by law, you agree that you will not bring,**

> **join or participate in any class action lawsuit and/or class arbitration as to any claim, dispute or controversy that you may have against any Covered Entity and/or Company (including its employees, officers, directors, members, representatives and/or assigns). You agree to the entry of injunctive relief to stop such a class action lawsuit and/or class arbitration, as applicable, or to remove you as a participant in the suit and/or class arbitration, as applicable. You agree to pay the attorney's fees and court costs that Company and/or any Covered Party incurs in seeking such relief. This provision preventing you from bringing, joining or participating in class action lawsuits and/or class arbitrations: (i) does not constitute a waiver of any of your rights or remedies to pursue a claim individually, and not as a class action or class arbitration, in binding arbitration as provided above; and (ii) is an independent agreement. You may opt-out of these dispute resolution provisions by providing written notice of your decision within thirty (30) days of the date that you first access the Site**.

*Id.*, Ex. C at § 19 (emphasis in original).

Additionally, the Terms of Service define "Covered Parties," "WHO ARE EXPRESS THIRD PARTY-BENEFICIARIES OF THE MANDATORY ARBITRATION PROVISION," to include DMS and "ITS PARENT, SUBSIDIARIES, RELATED PARTIES, THIRD-PARTY SERVICE PROVIDERS AND MARKETING PARTNERS." *Id.* at 1. USHA is a "marketing partner." In the consent language under the "Compare Rates" button, there is a blue, hyperlinked text that reads "Healthmarketadvisor.com partners." Giardina Decl. at ¶¶ 10-12. Clicking on the hyperlinked list of "Healthmarketadvisor.com partners" on the Site opens up a new browser window with the title "Carriers and partner companies include, without limitation the following." *Id.* at ¶ 11. "US Health Advisors" and "USHA" were both on the list on February 6, 2025. *Id.* at ¶¶ 11-12 & Ex. B thereto.

## ARGUMENT

## I. APPLICABLE LEGAL STANDARDS

Section 4 of the FAA permits a court to compel arbitration when one party, as in this case, has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4. Arbitration agreements are governed by and enforceable under the FAA. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 23-24 (1991). "Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of such agreements." *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2009) (citing *Perry v. Thomas*, 482 U.S. 483 (1987)). The FAA and the strong federal policy favoring arbitration that it evidences require courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

Consistent with that strong federal policy favoring arbitration, "[f]ederal law counsels that questions of arbitrability, when in doubt, should be resolved in favor of arbitration." *Id.* (citing *Moses H. Cone Mem'l Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Thus, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l*, 460 U.S. at 24-25. *See also Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004) (explaining that "it is the role of courts to 'rigorously enforce agreements to

arbitrate'" and construe any doubt in favor of arbitrability).

"Courts consider three factors in addressing a motion to compel arbitration: '(1) whether a valid written agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitrate was waived.'" *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1294 (S.D. Fla. 2017) (internal quotation omitted). Because "[a] motion to compel arbitration is treated generally as a Federal Rule of Civil Procedure 12(b)(1) motion to dismiss for lack of subject matter jurisdiction," a "court 'may consider matters outside the four corners of the complaint.'" *Reel Games, Inc. v. Euro Game Tech., Ltd.*, No. 0:24-CV-60713, 2025 WL 1555407, *3 (S.D. Fla. June 2, 2025) (quoting *Calcaterra v. Baptist Health S. Fla., Inc.*, 733 F. Supp. 3d 1349, 1353 (S.D. Fla. 2024)).

## II. THE COURT SHOULD COMPEL ARBITRATION

### A. A Valid Written Arbitration Agreement Exists

Plaintiff entered into a written agreement requiring her to arbitrate her claims against USHA concerning requests to be contacted by USHA when she agreed to the Terms of Service on the Site, including the arbitration provision. The Site's Terms of Service provide that "[t]he Agreement shall be treated as though it were executed and performed in New York, New York and shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of law principles)." Giardina Decl., Ex. C at § 19.

Under New York law, "[i]t is a basic tenet of contract law that, in order to be binding, a contract requires a meeting of the minds and a manifestation of mutual

assent." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). *See also Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999). "When an offeree does not have actual notice of certain contract terms, [the offeree] is nevertheless bound by such terms if [the offeree] is on inquiry notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Starke*, 913 F.3d at 289. "New commerce on the Internet . . . has not fundamentally changed the principles of contract." *Register.com v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). *See also, e.g., Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) ("whether an arbitration agreement exists at all is simply a matter of contract") (internal quotations and citations omitted).

One of the primary means of forming a contract on the Internet is the "'clickwrap' (or 'click-through') agreement, in which website users typically click an 'I agree' box after being presented with a list of terms and conditions of use." *IT Strategies Grp., Inc. v. Allday Consulting Grp., L.L.C.*, 975 F. Supp. 2d 1267, 1280 (S.D. Fla. 2013) (quoting *Hines v. Overstock.com*, 668 F. Supp. 2d 362, 366 (E.D.N.Y. 2009)). *See also, e.g., Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1302 (M.D. Fla. 2018) (explaining clickwrap agreements "require a user to affirmatively click a box on the website acknowledging awareness of an agreement to the terms of service before he or he is allowed to proceed with further utilization of the website") (quoting *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015)).

"Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (applying California law but noting New York and California apply substantially the same rules for determining whether there has been mutual assent necessary to form a contract) (citing *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012) (collecting cases)). *See also Temple*, 360 F. Supp. 3d at 1302 (applying New York law, observing "courts generally find" "[c]lickwrap agreements" "enforceable"); *Whitt v. Prosper Funding LLC*, No. 1:15-CV-136-GHW, 2015 WL 4254062, at 5 (S.D.N.Y. July 14, 2015) (collecting cases). To be bound by an arbitration agreement contained in a clickwrap agreement, the web-user must have "reasonable notice of the arbitration provision." *Starke*, 913 F.3d at 292. When determining whether a plaintiff assented to the terms of a web-based contract, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put [the offeree] on inquiry notice of such terms." *Id.* at 289.

In the context of web-based contracts, New York law considers this from the perspective of a "reasonably prudent internet user." Such a person is someone who "is not a complete stranger to computers or smartphones, having some familiarity with how to navigate to a website or download an app." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703–04 (2d Cir. 2023). Under New York law, where the terms are "'linked' on an 'uncluttered' interface and temporally and 'spatially coupled

with the mechanism for manifesting assent,' and the user does not need to scroll beyond what is immediately visible to find the terms . . . the interface provided reasonably conspicuous notice of the existence of contractual terms." *Id.* (quoting *Meyer*, 868 F.3d at 78-79). In other words, "[a]s long as the hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms." *Meyer*, 868 F.3d at 78 ("That the Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice".).

The Site provided reasonably prudent users, such as Plaintiff, with inquiry notice of the Arbitration Agreement contained in the Terms of Service. There are "no particular features that must be present to satisfy the reasonably conspicuous standard," (*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 842 (2d Cir. 2021)), because "there are infinite ways to design a website . . . ." *Meyer*, 868 F. 3d at 75. The Site is demonstrably uncluttered, the link to the Terms of Service is prominently featured in blue font in the same size as the rest of the text, standing out against the white background and among the surrounding black text, and thus was clearly visible and made clear that the Terms of Service were hyperlinked (where Plaintiff could read the full Arbitration Agreement). *See* Giardina Decl. at ¶ 10. *Accord, e.g.*, *Hu v. Whaleco, Inc.*, No. 23-CV-6962 (MKB), 2024 WL 4481439, *12-15 (E.D.N.Y. Oct. 1, 2024) (collecting cases). Thus, "a user would have reasonable notice of the existence of the arbitration provision" because "a reasonably prudent smartphone user knows that text that is highlighted in blue

. . . is hyperlinked to another webpage where additional information will be found." *Meyer*, 868 F.3d at 77-78.[2] "The mere lack of an underline does not materially change the Court's analysis, such that a different result is compelled." *Babcock v. Neutron Holdings, Inc.*, 454 F. Supp. 3d 1222, 1231 n.7 (S.D. Fla. 2020) ("Even though the "User Agreement" hyperlink on Lime's sign-up page is not underlined, the hyperlink appearing in blue boldface font stands out from the only other font on the page, which is black and white."). *See also Hu*, 779 F. Supp. 3d at 290 ("The Court finds unpersuasive Plaintiffs' and Amici's arguments that Defendant did not provide Plaintiffs with reasonably conspicuous notice because the hyperlink was not in large font, capitalized, underlined, or in a color that sharply contrasted with the Registration Screen's background given that 'there are infinite ways to design a website or smartphone application' and 'there are no particular features that must be present to satisfy the reasonably conspicuous standard.'").

With respect to the second element of the test, courts find an unambiguous manifestation of assent when "the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound . . . . In other words, where an internet or smartphone user does not explicitly say 'I agree' to the contractual terms, a court must determine whether a reasonably prudent user would understand his or her conduct

[2] *See also Peiran Zheng v. Live Auctioneers LLC*, No. 20-CV-9744 (JGK), 2021 WL 2043562, *5 (S.D.N.Y. May 21, 2021) (applying *Meyer* as statement of New York law and finding similar facts established notice); *Temple*, 360 F. Supp. 3d at 1304 (finding reasonable notice of agreement where "Plaintiff was cautioned that clicking the 'Get a Quote' button would indicate his acceptance to the Agreement available via the Terms and Conditions Hyperlink").

to constitute assent to those terms." *Edmundson*, 85 F.4th at 704. Here, while using the Site, "[a] reasonable user would know that by clicking the ['Compare Rates'] button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not." *Meyer*, 868 F.3d at 79-80. "The fact that clicking the . . . button had two functions—[comparing health insurance rates] and assent to the Terms of Service—does not render [Plaintiff's] assent ambiguous" because the submission "process allowed [Plaintiff] to review the Terms of Service prior to [submission], unlike web platforms that provide notice of contract terms only after the user manifested his or her assent." *Id.* at 80. The substance of the Site at issue clearly and explicitly explained the legal significance of the action button immediately below the button: "By clicking the button above, I expressly consent to receive emails, calls and/or text messages," and, at the end of the disclosure, "I agree to the Privacy Policy and Terms of Service provided." Giardina Decl. at ¶¶ 9-10.[3]

Indeed, only a few months ago another district court held the exact same Site at issue in this case, with respect to a visit a year earlier when the Site had the same layout and virtually identical language, provided "clear notice of the Terms

[3] *Accord Meyer*, 868 F.3d at 78-79 (concluding "Uber App provided reasonably conspicuous notice of the Terms of Service" when "[t]he text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appears directly below the buttons for registration"); *Hu*, 779 F. Supp. 3d at 292 (finding website gave reasonably conspicuous notice of terms where "the hyperlink was located at the bottom of the Registration Screen, below the 'Continue' button and other buttons allowing a user to register through existing accounts" because "the Registration Screen appear[ed] uncluttered, [was] visible at once, and the notice and bolded hyperlinks [were] reasonably conspicuous and spatially and temporally coupled with a user's creation of an account").

of Use," "admonished [the visitor] that, by clicking the 'Compare Rates' button, he was agreeing to be bound by the Terms of Use," and "click[ing] the button . . . manifest[ed] [the visitor's] assent to the Terms of Use." *Thomas* (Ex. AA) at 5-6. The same is true in this case.

Moreover, "screen captures" using data tracked by an industry leader in lead validation, Jornaya, during Plaintiff's visit to the Site provide visual evidence of her visit. *Id.* at ¶¶ 17-22 & Ex. D thereto. Plaintiff therefore cannot plausibly dispute that she visited the Site on February 6, 2025, saw the layout and text as described herein, and made a submission on the Site in part to receive phone calls and text messages, all of which affected her agreement to the Terms of Service (including mandatory arbitration). Thus, there is a valid agreement to arbitrate.[4]

### B. Plaintiff Agreed to Delegate to the Arbitrator Resolution of Challenges to the Arbitration Agreement's Scope and Enforceability

As for any other issues of arbitrability, those have been delegated to the

[4] Plaintiff has already denied that she ever gave permission to USHA to call her telephone number. "A Plaintiff can raise a genuine issue of fact regarding the validity of an arbitration agreement by (1) making an unequivocal denial that there was an agreement, and (2) producing evidence to substantiate the denial." *Hilton v. Fluent*, 297 F. Supp. 3d 1337, 1341 (S.D. Fla. 2018) (citation and internal quotations omitted). Plaintiff's self-serving, conclusory denial is insufficient, and USHA has not been provided any evidence in support of that denial. But, at most, that would create a triable issue of fact as to whether Plaintiff was the one who made the submission on the Site and thereby entered into the Arbitration Agreement. Where the issue is before a court, the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. The Court applies a "summary judgment-like standard" and consequently "may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if 'there is no genuine dispute as to any material fact' concerning the formation of such an agreement." *Bazemore*, 827 F.3d at 1333 (quoting Fed. R. Civ. P. 56(a)). Under this procedure, "[t]he parties may not address other issues, including merits issues, before the court resolves these formation questions and [the] motion to compel." *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 844 (6th Cir. 2021) (quoting 9 U.S.C. § 4).

arbitrator and are not relevant considerations on the Motion to Compel Arbitration. "Parties to an arbitration agreement can agree to arbitrate 'gateway' questions of 'arbitrability', such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010). If parties to an arbitration agreement have clearly and unmistakably agreed to delegate issues of arbitrability to the arbitrator, then the court cannot override that intention and the arbitrator must decide these threshold issues, "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67-68, 71 (2019). *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

#### 1. The Arbitration Agreement Clearly and Unmistakably Delegates to the Arbitrator any Arbitrability Disputes

The Arbitration Agreement provides that the arbitrator – not a court – is to decide issues of arbitrability in stating that the arbitration will take place "before the American Arbitration Association in New York, New York, in accordance with the then current Commercial Arbitration rules of the American Arbitration Association (the 'AAA')." Giardina Decl. at ¶ 14, Ex. C at § 19.[5] The Eleventh Circuit has recognized that "[b]y incorporating the AAA Rules . . . into their agreement,

[5] Rule R-7 of the AAA's Commercial Arbitration Rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim," including "the existence or validity of a contract of which an arbitration clause forms a part." Ex. BB at Rule R-7(a) & (b).

the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid" as well as any other issues regarding arbitrability. *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005). *See also*, *e.g.*, *JPay, Inc. v. Kobel*, 904 F.3d 923, 937 (11th Cir. 2018).

The incorporation of the AAA Commercial Arbitration Rules wherein the arbitrator determines gateway issues of arbitrability thus constitutes clear and unmistakable evidence that parties agreed to arbitrate arbitrability. "[T]he clear and unmistakable meaning of the clause is the one we have laid out: all questions of arbitrability are delegated to an arbitrator, as long as the law does not prohibit the delegation of threshold arbitrability issues." *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1301 (11th Cir. 2022). *See Foote v. All Elite Wrestling, LLC*, No. 3:24-cv-1206-HES-MCR, 2025 WL 1913228, *2 (M.D. Fla. July 10, 2025) ("The Eleventh Circuit enforces parties' agreements to refer threshold questions of arbitrability to the arbitrator"). Because it is what Plaintiff agreed to, and required by controlling law, this Court should compel Plaintiff to arbitrate any remaining gateway question of arbitrability. "Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator," "even if the court thinks that a party's [position] is frivolous." *Henry Schein*, 586 U.S. at 68-69.

### 2. Plaintiff's Claims are Within the Scope of the Arbitration Agreement

As discussed above, the Arbitration Agreement delegates all scope, enforceability and validity issues to the arbitrator, and therefore, the Court does not need to address whether any claims are within the scope of the arbitration agreement. If necessary, however, the Arbitration Agreement's plain language makes clear that Plaintiff's pending claims are well within its scope and USHA is entitled to enforce the Arbitration Agreement.

In determining the scope of an arbitration clause, courts look at the parties' intent to submit the dispute to arbitration, starting at the language of the arbitration provision, and construing any doubt in favor of arbitrability in accordance with the strong federal policy favoring arbitration. *See, e.g., Mitsubishi*, 473 U.S. at 626 ("Thus, as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."). The Supreme Court has explained that "[t]he [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone Mem'l*, 460 U.S. at 24-25.

The Arbitration Agreement on the Site states, in relevant part,

> **You hereby agree to arbitrate all claims that may arise under the Agreement that you may have against Company or any of the Covered Parties, who are express third-party beneficiaries of the mandatory arbitration provision. Without limiting the foregoing, should a dispute arise between you and Company**

> **and/or any Covered Party including, without limitation, any matter concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto: (a) you agree to submit the dispute for resolution by arbitration before the American Arbitration Association in New York, New York, in accordance with the then current Commercial Arbitration rules of the American Arbitration Association (the "AAA") . . . .**

Giardina Decl., Ex. C at § 19.

The term "Covered Parties" is defined to include the "**COMPANY, AS WELL AS ITS PARENT, SUBSIDIARIES, RELATED PARTIES, THIRD-PARTY SERVICE PROVIDERS AND MARKETING PARTNERS.**" *Id.* at 1. USHA is both a "marketing partner" and a "Third-Party Service Provider" because it was listed as a marketing partner on the Site on February 6, 2025. Giardina Decl. at ¶¶ 11-12, 15 & Ex. B thereto.[6] And all of Plaintiff's claims raise matters "concerning the Site Offerings," (*id.* at § 19), a term that includes any "request to be contacted by . . . 'Third-Party Service Providers' . . . ." *Id.* Similar to *Thomas*, the language on the Site made clear that by clicking the "Compare Rates" button, Plaintiff consented and requested to be contacted by, among others, USHA for health insurance quotes. *See id.* at ¶¶ 9-12, 15; Ex. AA at 5-6.

### 3. USHA Can Enforce the Arbitration Agreement

The question of whether USHA can enforce the Arbitration Agreement is among the arbitrability questions delegated to the arbitrator. *Accord*, *e.g.*, *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) ("[W]hether Rees can enforce the

---

[6] The Terms of Service define a "Third-Party Service Providers" to be DMS's "third-party health insurance-related product and/or service providers." *Id.*, Ex. C at 1.

arbitration agreement against Swiger presents a question of arbitrability that Swiger's arbitration agreement delegated to an arbitrator."); *Bell v. Royal Seas Cruises, Inc.*, No. 19-CV-60752, 2020 WL 5742189, *4-5 (S.D. Fla. May 13, 2020) (holding "Plaintiff's third-party beneficiary argument is for the arbitrator to decide" because the parties' delegation provision "encompasses the third-party beneficiary dispute"), report and recommendation adopted, 2020 WL 5639947 (S.D. Fla. Sept. 21, 2020); *Neal v. GMRI, Inc.*, No. 1:19-CV-647-RAH, 2020 WL 698270, *5 (M.D. Ala. Feb. 11, 2020) (holding dispute "concerning the application and scope of the [arbitration] agreement to the Defendants is a dispute of arbitrability that must be submitted to the arbitrator for resolution").

Regardless, even if decided by the Court, there can be no question USHA can enforce the Arbitration Agreement both as an express third party beneficiary and under the doctrine of estoppel. *Accord GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 437 (2020) ("[A]rbitration agreements may be enforced by nonsignatories through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.") (internal quotation omitted).

Paragraph 3 of the Terms of Service clearly states that marketing partners such as USHA are "Covered Parties" and are considered express third-party beneficiaries of the mandatory Arbitration Agreement. The Terms of Service could not be clearer, and state in bolded, all capital letters:

> **THE AGREEMENT CONTAINS DISCLAIMERS OF WARRANTIES, LIMITATIONS OF LIABILITY, RELEASES, A**

> **CLASS-ACTION WAIVER, AND THE REQUIREMENT TO ARBITRATE ANY AND ALL CLAIMS THAT MAY ARISE HEREUNDER AGAINST COMPANY, AS WELL AS ITS PARENT, SUBSIDIARIES, RELATED PARTIES, THIRD-PARTY SERVICE PROVIDERS AND MARKETING PARTNERS (COLLECTIVELY, "COVERED PARTIES"), WHO ARE EXPRESS THIRD-PARTY BENEFICIARIES OF THE MANDATORY ARBITRATION PROVISION. THE AFOREMENTIONED PROVISIONS ARE AN ESSENTIAL BASIS OF THE AGREEMENT.**

Giardina Decl., Ex. C at 1. This clearly applies to USHA, as both "US Health Advisors" and "USHA" are included in the Site's list of marketing partners and were included on February 6, 2025 as well. *Id.* at ¶¶ 11-12 & Ex. B thereto.

Additionally, the language of the Arbitration Agreement acknowledges that the mandatory arbitration applies to "all claims that may arise under the Agreement that you may have against Company or any of the Covered Parties, who are express third-party beneficiaries of the mandatory arbitration provision." Giardina Decl., Ex. C at § 19. Further, the Arbitration Agreement is clear that it is not limited to disputes between DMS and Plaintiff and states, "[w]ithout limiting the foregoing, should a dispute arise between you and Company ***and/or any Covered Party*** including, without limitation, any matter concerning the Site Offerings, the terms and conditions of the Agreement or the breach of same by any party hereto . . . ." *Id.* (emphasis added). As the court in *Thomas* found in construing the exact same language, this contract language is more than sufficient to render USHA an intended third-party beneficiary under New York law because New York courts repeatedly hold that a third party named in a contract, either directly or as a member of a specified class, can enforce arbitration provisions as a

third-party beneficiary. Ex. AA at 5-6.[7]

Moreover, New York's law of estoppel allows USHA to enforce the Arbitration Agreement because under New York law, "signatories to an arbitration agreement can be compelled to arbitrate their claims with a non-signatory where "the relationship among the parties, the contracts they signed . . ., and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (quoting *JLM Indus. v. Stolt–Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004)). *See also Temple*, 360 F. Supp. 3d at 1309 (applying intertwinedness test). Plaintiff is suing over text messages and telephone calls allegedly made by USHA, a listed partner on the Site, when she agreed to arbitrate disputes with any such listed partner concerning requests to be contacted. *See* Giardina Decl., Ex. C at § 19. Thus, Plaintiff is estopped from avoiding arbitration with USHA.

### 4. The Right to Compel Arbitration Has Not Been Waived

Finally, in an abundance of caution, USHA has not waived the right to arbitrate Plaintiff's claims. "[W]aiver of the right to arbitration occurs 'when a party . . . *substantially participates* in litigation to a point inconsistent with an intent to arbitrate." *Soriano v. Experian Info. Sols., Inc.*, No. 2:22-CV-197-SPC-

---

[7] *See In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 292 (S.D.N.Y. 2021); *Nicholas v. Wayfair Inc.*, 410 F. Supp. 3d 448, 456 (E.D.N.Y. 2019); *Bakon v. Rushmore Serv. Ctr., LLC*, No. 16-CV-6137, 2017 WL 2414639, *3 (E.D.N.Y. 2017); *Saratoga Schenectady Gastroenterology Assocs., P.C. v. Bette & Cring, LLC*, 83 A.D.3d 1256, 1257-58 (N.Y. 3d Dep't 2011).

KCD, 2022 WL 6734860, *3 (M.D. Fla. Oct. 11, 2022) (quoting *Morewitz v. W. of England Ship Owners Mut. Prot. & Indem. Ass'n (Luxembourg)*, 62 F.3d 1356, 1366 (11th Cir. 1995)), objections overruled, 2022 WL 17551786 (M.D. Fla. Dec. 9, 2022). USHA is moving to compel arbitration before filing any response to the Complaint, and before engaging in any discovery. It has not acted inconsistent with its right to arbitration and nothing like the kind of delay or substantial participation in litigation before invoking the right to arbitration has occurred in the brief history of this case.[8]

## CONCLUSION

For the foregoing reasons, the Court should enter an order compelling the arbitration of Plaintiff's claims and staying the proceedings under Section 3 of the FAA until the arbitrator enters a final award.

## LOCAL RULE 3.01(g) CERTIFICATE

Undersigned counsel certifies that, in accordance with Local Rule 3.01(g), counsel for USHA conferred with counsel for Plaintiff on December 15, 2025 by e-mail and then on December 16, 2025 by telephone regarding the substance and grounds for this Motion. Counsel for Plaintiff responded that Plaintiff opposes the requested relief.

[8] *See*, *e.g.*, *Morewitz*, 62 F.3d at 1366 (finding waiver where five years elapsed before arbitration was invoked); *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. 1990) (same after twenty-month delay).

Dated: December 19, 2025

Respectfully submitted,

GREENSPOON MARDER LLP

By: */s/ Roy Taub*

JEFFREY A. BACKMAN
Florida Bar No. 662501
ROY TAUB
Florida Bar No. 116263
JACOB MARS
Florida Bar No. 1050896
200 East Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Tel: (954) 491-1120
Fax: (954) 213-0140
jeffrey.backman@gmlaw.com
roy.taub@gmlaw.com
jacob.mars@gmlaw.com
rene.vazquez@gmlaw.com
cheryl.cochran@gmlaw.com

*Attorneys for Defendant*
*USHEALTH Advisors, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 19, 2025, a true and correct copy of the foregoing was electronically filed on the Court's CM/ECF document filing system, which will send notice of filing and a service copy to all counsel of record.

*/s/ Roy Taub*
ROY TAUB